**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 23-1718

UNITED THERAPEUTICS CORPORATION,

Petitioner - Appellant,

v.

COMMISSIONER OF INTERNAL REVENUE,

Respondent - Appellee.

Appeal from the United States Tax Court.  (Tax Ct. No. 10210-21)

Argued:  January 25, 2024                     Decided:  June 24, 2024

Before THACKER, HARRIS, and RUSHING, Circuit Judges.

Affirmed by published opinion.  Judge Harris wrote the majority opinion, in which Judge Thacker and Judge Rushing joined.

**ARGUED:**  Thomas Henderson Dupree, Jr., GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellant.   Sherra Tinyi Wong, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.  **ON BRIEF:** Lucas C. Townsend, Saul Mezei, John F. Craig, III, GIBSON, DUNN & CRUTCHER LLP, Washington, D.C., for Appellant.  David A. Hubbert, Deputy Assistant Attorney General, Jacob Earl Christensen, Tax Division, UNITED STATES DEPARTMENT OF JUSTICE, Washington, D.C., for Appellee.

PAMELA HARRIS, Circuit Judge:

A tax provision coordinating one tax credit with another prohibits double-counting. The Commissioner of Internal Revenue issued United Therapeutics a notice of deficiency on its 2014 tax return, claiming that it disregarded one of the provision's two commands, improperly shrinking its tax liability by over a million dollars. The company challenges the Commissioner's determination, arguing that the relevant half of the coordination provision lost effect in 1989 and has been moribund since. Like the tax court, we disagree: Construing the statute's terms by reference to their ordinary meaning gives effect to the full coordination provision. We therefore affirm.

## I.

## A.

This case sits at the intersection of two tax credits that seek to encourage research. The first, termed the "research credit," is codified at I.R.C. § 41.[1] As suggested by its formal title, "Credit for increasing research activities," its purpose is to incentivize taxpayers to increase their investment in research year over year. *See Geosyntec Consultants, Inc. v. United States*, 776 F.3d 1330, 1334 (11th Cir. 2015). The research credit has various components, but the one at issue here is for "qualified research expenses," and it pegs the amount of the credit to increases in such expenses over time:

---

[1] I.R.C. refers to the Internal Revenue Code, found at Title 26 of the United States Code.

The more "qualified research expenses" a company incurs by comparison to prior years, the greater the credit. *See generally* I.R.C. §§ 41(a)(1), (b).

The second, termed the "orphan drug credit," is codified at I.R.C. § 45C. This credit encourages pharmaceutical companies to develop "orphan drugs" – drugs treating diseases so rare that companies would otherwise have little financial incentive to address them. *See Catalyst Pharm., Inc. v. Becerra*, 14 F.4th 1299, 1302 (11th Cir. 2021). In any given tax year, a company can elect to claim an orphan drug credit equal to a percentage of its "qualified clinical testing expenses" – a figure distinct from its § 41 "qualified research expenses." I.R.C. §§ 45C(a), (d)(4) (2014).[2] This credit is more generous than the § 41 research credit but generally applies to a smaller pool of expenses.

Given the similar goals of the § 41 research credit and the § 45C orphan drug credit, a company may have what we will call "overlapping expenses" – that is, expenses that are simultaneously "qualified research expenses" per § 41 and "qualified clinical testing expenses" per § 45C. Anticipating this overlap, Congress included a "coordination provision" in § 45C, instructing taxpayers on the credits' interaction:

> Sec. 45C(c). Coordination with credit for increasing research expenditures.
> (1) In general. – Except as provided in paragraph (2), any qualified clinical testing expenses for a taxable year to which an election under this section applies shall not be taken into account for purposes of determining the credit allowable under section 41 for such taxable year.

---

[2] In 2014, the year at issue, the credit amount was equal to 50 percent of a taxpayer's "qualified clinical testing expenses." A subsequent amendment reduced that figure to 25 percent, where it sits today. *See* Tax Cuts and Jobs Act, Pub. L. No. 115-97, § 13401, 131 Stat. 2054, 2134 (2017).

(2) Expenses included in determining base period research expenses. – Any qualified clinical testing expenses for any taxable year which are qualified research expenses (within the meaning of section 41(b)) shall be taken into account in determining base period research expenses for purposes of applying section 41 to subsequent taxable years.

I.R.C. § 45C(c).

This provision prohibits taxpayers from double-counting their overlapping expenses in two ways. Paragraph 1 is straightforward: If a company counts an overlapping expense as a "qualified clinical testing expense" in a given tax year, taking advantage of § 45C's more generous credit, it cannot simultaneously claim the expense as a "qualified research expense" eligible for the § 41 credit. *See* I.R.C. § 45C(c)(1). Paragraph 2 is just a little trickier: Excluding that overlapping expense altogether under § 41 would deflate the baseline against which § 41's year-over-year increase in research expenditures is measured and thus *inflate* the extent of any future increase and resulting research credit. To avoid this distortion, Paragraph 2 requires taxpayers that have elected the orphan drug credit to include in future years any overlapping expenses in calculating their baseline research spending under § 41: They must "take[] into account" those overlapping expenses "in determining base period research expenses for purposes of applying section 41 to subsequent taxable years." I.R.C. § 45C(c)(2). In other words, a company can elect § 45C's orphan drug credit for overlapping expenses, but it cannot also use those same expenses to increase its § 41 research credit – either by adding them to its credit-year research spending (Paragraph 1) or subtracting them from past spending (Paragraph 2).

4

*See United Therapeutics Corp. v. Comm'r*, 160 T.C. No. 12, 2023 WL 3496208, at *3-6 (May 17, 2023) (describing the relevant statutory provisions).[3]

**B.**

1.

United Therapeutics is a biotechnology company that develops products to address the unmet medical needs of patients with chronic and life-threatening conditions. In each tax year from 2011 through 2014, it claimed both the § 41 research credit and the § 45C orphan drug credit.

With respect to its expenses eligible only for the § 41 research credit, United Therapeutics claimed (naturally) only the § 41 research credit. Section 41 offers a menu of ways to calculate its credit. In 2014 – the year at issue – United Therapeutics elected the "alternative simplified method." *See* I.R.C. § 41(c)(5) (2014).[4] Under that method, the company's credit is equal to 14 percent "of so much of the qualified research expenses for the taxable year as exceeds 50 percent of the average qualified research expenses for the 3 taxable years preceding" the credit year. I.R.C. § 41(c)(5)(A).

---

[3] Our description of these tax provisions is necessarily somewhat abbreviated. For a more thorough discussion of this complex area, complete with examples, we commend the detailed analysis of the tax court.

[4] The statute has since been amended and § 41(c)(5) is now § 41(c)(4). *See* Consolidated Appropriations Act, 2018, Pub. L. No. 115-141, § 101(c), 132 Stat. 348, 1160 (2018). Like the tax court, we refer to the version of the statute in effect in 2014. For our purposes, however, the changes are purely cosmetic, as the relevant parts of § 41 and the coordination provision continue to operate today as they did then.

With respect to its overlapping expenses, United Therapeutics elected to claim the more generous § 45C credit. That decision, all agree, triggered § 45C(c)'s coordination provision. The question in this case is whether United Therapeutics properly accounted for that provision.

When calculating its "qualified research expenses" for the 2014 tax year under § 41(c)(5)(A), United Therapeutics followed Paragraph 1 of the coordination provision, excluding the 2014 expenses it was claiming as qualified clinical testing expenses under § 45C. *See* I.R.C. § 45C(c)(1). So far, so good. But it also excluded the overlapping expenses it had treated as qualified clinical testing expenses for the three *preceding* tax years, 2011 through 2013, when it calculated its baseline "average qualified research expenses for the 3 taxable years preceding" 2014, see I.R.C. § 41(c)(5)(A). That made the company's past investment in research appear smaller – which in turn made its 2014 investment look like a more dramatic increase.

According to the Commissioner of Internal Revenue, this latter exclusion ran afoul of Paragraph 2 of the coordination provision, instructing taxpayers to "take[] into account" "[a]ny qualified clinical testing expenses . . . which are qualified research expenses . . . in determining base period research expenses for purposes of applying section 41 to subsequent taxable years." I.R.C. § 45C(c)(2). After auditing United Therapeutics, the Commissioner issued a notice of deficiency. *See generally* I.R.C. § 6212. The company's disregard for Paragraph 2, the Commissioner concluded, improperly inflated its § 41 research credit by about $1.2 million.

6

2.

United Therapeutics timely petitioned the United States Tax Court for a redetermination of the Commissioner's deficiency notice. *See generally* I.R.C. § 6213(a). The parties agreed on the facts, which they submitted fully stipulated to the tax court. They differed only on a narrow but critical question of statutory interpretation: United Therapeutics maintained that it calculated its 2014 tax liability correctly because changes to § 41 since its enactment rendered Paragraph 2 of the coordination provision, § 45C(c)(2), a dead letter.

That counterintuitive result, United Therapeutics argued, was compelled by 1989 amendments to § 41. Paragraph 2, again, instructs taxpayers to include overlapping expenses "in determining base period research expenses" for purposes of § 41. I.R.C. § 45C(c)(2). In 2014 as today, neither the coordination provision nor § 41 defined "base period research expenses." But an earlier version of § 41 did: It defined "base period research expenses" as "the average of the qualified research expenses for each year in the base period" and defined "base period" as "the 3 taxable years immediately preceding" the credit year. I.R.C. §§ 41(c)(1)-(2) (1986). Congress removed that definition in a 1989 overhaul of the provision. *See* Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 7110(b)(1), 103 Stat. 2106, 2323-25 (1989); *United Therapeutics*, 2023 WL 3496208, at *11 n.33 (tax court's summary of § 41's evolution). And when it did so, United Therapeutics argued, Congress also intended – but forgot – to eliminate Paragraph 2 of the coordination provision.

7

3.

In a thorough and deeply reasoned opinion, the tax court rejected United Therapeutics' argument and resolved the case in favor of the Commissioner. *See generally United Therapeutics*, 2023 WL 3496208. Because we agree fully with the court's analysis, we describe it in some detail here.

The place to start in interpreting Paragraph 2 of the coordination provision, the court reasoned, was with a "careful examination of the ordinary meaning and structure of the law itself." *Id.* at *7 (quoting *Food Mktg. Inst. v. Argus Leader Media*, 588 U.S. 427, 436 (2019)). The critical phrase "base period research expenses" was undefined in the 2014 statute. But its ordinary meaning supported the Commissioner's reading, under which it applied to expenses incurred during the "3 [preceding] taxable years" § 41(c)(5)(A) uses as a benchmark in calculating the research credit.

The term "base period," the court explained, has consistently meant "a period of time used as a standard of comparison in measuring changes . . . at other periods of time." *Id.* (quoting *Base Period*, *Webster's Encyclopedic Unabridged Dictionary of the English Language* (1989)). Moreover, that is how Congress has used the term in other tax-code contexts, including the one provision in which § 41 defines the term. *Id.* at *7 & n.24 (discussing I.R.C. § 41(e)(7)(B), which defines "base period" – for purposes of subsection (e) only – as "the 3-taxable-year period ending with the taxable year immediately preceding the 1st taxable year of the taxpayer"). So Paragraph 2's reference to "base period research expenses" means "research expenses that are incurred during the base period – i.e., the period of time section 41 employs as a standard of comparison." *Id.* at *7.

8

That plain-meaning definition, the court went on, fit nicely with the statutory scheme. *Id.* at *8. So defined, the phrase "base period research expenses" directs the taxpayer to whatever point of comparison is being used under § 41 to calculate its year-over-year increase in research expenses. *Id.* Here, where United Therapeutics elected § 41(c)(5)(A)'s alternative simplified method, that point of comparison is "the 3 taxable years preceding the" credit year. I.R.C. § 41(c)(5)(A). And so Paragraph 2 of the coordination provision, "interpreted according to its ordinary meaning," meant just what the Commissioner said: United Therapeutics was required to include in its § 41 calculation of research spending from "the 3 [preceding] taxable years" any overlapping expenses for which it had claimed the orphan drug credit. *United Therapeutics*, 2023 WL 3496208, at *8.

The court rejected United Therapeutics' arguments for "resist[ing] th[is] straightforward reading" of the coordination provision as applied to § 41(c)(5)(A). *Id.* The company's primary argument, the court explained, rested not on the 2014 text of either provision but instead on a prior version of § 41, which included a definition of "base period research expenses." It followed, United Therapeutics contended, that when Congress used that phrase in Paragraph 2 it meant to incorporate a statutory definition since repealed, leaving Paragraph 2 with no present effect.

That argument, the court concluded, was flawed in multiple respects. First, it contravened the Supreme Court's instruction that "[t]he starting point in discerning congressional intent is the existing statutory text, . . . *and not the predecessor statutes*." *Id.* at *9 (quoting *Lamie v. U.S. Tr.*, 540 U.S. 526, 534 (2004) (emphasis in tax court opinion)).

9

Courts are to "interpret undefined terms in the *existing text* in accordance with their ordinary meaning," and so long as "that meaning is clear and produces a nonabsurd result, our analysis is finished." *Id*. Predecessor statutes, in other words, may not be used to manufacture ambiguity. *Id.* at *9-11.

Second, United Therapeutics' position would render Paragraph 2 of the coordination provision, § 45C(c)(2), entirely defunct – leaving half the coordination provision superfluous and effectuating a disfavored repeal by implication. *Id.* at *12. That result would be especially anomalous here, the court explained, where Congress had retained the purportedly moribund statutory language – both § 45C(c)(2) itself and the reference to it in § 45C(c)(1)[5] – through over a dozen amendments to § 41's research credit and § 45C's orphan drug credit. *Id.* at *12-13. "Congress had a number of opportunities to delete or modify the reference to base period research expenses in section 45C(c)(2) if it was in fact deadwood. . . . But with every amendment, Congress left section 45C(c)(2) intact." *Id.* at *13.

Finally, the tax court doubted the very premise of United Therapeutics' argument: that Paragraph 2's "base period research expenses" was originally intended as a statutorily defined term. In 1983, when the orphan drug credit and coordination provision were first adopted, Paragraph 2's predecessor instructed that

---

[5] Paragraph 1 of the coordination provision, § 45C(c)(1), begins with a preview of Paragraph 2: "*Except as provided in paragraph (2)*," overlapping expenses for which the orphan drug credit has been claimed are not taken into account in determining § 41's research credit. I.R.C. § 45C(c)(1) (emphasis added).

10

> [a]ny qualified clinical testing expenses for any taxable year which are qualified research expenses (within the meaning of section 44F(b)) shall be taken into account in determining base period research expenses for purposes of applying section 44F to subsequent taxable years.

I.R.C. § 44H(c)(2) (1983).  When Congress intended to incorporate a statutory definition, the court reasoned, it said so, specifying that it was using "qualified research expenses" to mean the expenses falling "within the meaning of section 44F(b)."  But when Congress – in the very same sentence – addressed "base period research expenses," it omitted any comparable citation to what was then the term's specific statutory definition, referring instead to the section wholesale.  "Courts presume that when Congress includes certain language in one provision but omits it in another, the inclusion and exclusion are intentional."  *United Therapeutics*, 2023 WL 3496208, at *11 (citing *Loughrin v. United States*, 573 U.S. 351, 358 (2014)).  So even in 1983, "textual clues" suggested "base period research expenses" should be interpreted according to its ordinary meaning – which meant that "even on its own terms," United Therapeutics' backward-looking argument did not work.  *Id.*

The court then addressed two regulations United Therapeutics had relied on in support of its position.  First, the company pointed to a research-credit regulation covering, among other things, the calculation of "base period research expense[s]."  *See* Treas. Reg. § 1.41-3A.[6]  Promulgated in 1989, a few months before Congress repealed that term's statutory definition with its overhaul of § 41, and redesignated in 2001, the regulation

---

[6] Treasury Regulations are found in Title 26 of the Code of Federal Regulations.

specifies in a heading that it applies only to "Taxable Years Beginning Before January 1, 1990." United Therapeutics took the heading as confirmation that the phrase "base period research expense" lost meaning altogether after the amendments of 1989. The tax court disagreed. The limitation to taxable years preceding January 1990, the court explained, cabined the effect of the regulation itself; it did not purport to limit temporally any part of the statute. And, the tax court reasoned, "a predecessor regulation" could no more "cast doubt on the meaning of an existing statute's text" than a predecessor statute can. 2023 WL 3496208, at *9 n.30.

Finally, there was the "consistency rule" of Treas. Reg. § 1.41-9(c)(2), governing application of the alternative simplified research credit claimed here. That regulation requires that taxpayers calculate their qualified research expenses "for the three taxable years preceding the credit year . . . on a basis consistent with the definition of [qualified research expenses] for the credit year, without regard to the law in effect for the three taxable years preceding the credit year." Treas. Reg. § 1.41-9(c)(2). According to United Therapeutics, the consistency rule renders Paragraph 2 inoperable, because it does not permit excluding overlapping expenses from qualified research expenses for the credit year (per Paragraph 1) while simultaneously including them for the preceding years (per Paragraph 2).

Again, the tax court disagreed. The consistency rule, the court explained, goes only to the "*definition* of qualified research expenses," instructing taxpayers to apply the same definition "to the credit year and the three preceding years even if there has been a change in law." 2023 WL 3496208, at *17. That interpretation accords with the regulation's text

12

and with the Fifth Circuit's interpretation of the statutory consistency rule from which it derived. *Id.* (citing *Trinity Indus., Inc. v. United States*, 757 F.3d 400, 411-12 (5th Cir. 2014)). So understood, the regulation is entirely consistent with Paragraph 2 of the coordination provision and has no bearing on this case, in which all agree on what counts as "qualified research expenses."

As the tax court summarized it, the question raised here is "whether we should give effect to section 45C(c)(2)" – Paragraph 2 of the coordination provision – "based on the ordinary meaning of its terms or whether we should ignore the provision altogether as a no-longer-effective rule that Congress neglected multiple times to remove from the Code." *Id.* at *1. For the reasons given above, the court took the first option, applying Paragraph 2 "in accordance with its ordinary meaning" and finding in favor of the Commissioner. *Id.*

United Therapeutics timely appealed.

## II.

We have jurisdiction over appeals from the tax court under I.R.C. § 7482.[7] Our review of legal questions – the only sort at issue here – is de novo. *Pfister v. Comm'r*, 359 F.3d 352, 353 (4th Cir. 2004). On appeal, the parties make substantially the same arguments they pressed before the tax court. And substantially for the reasons given by

---

[7] United Therapeutics maintains principal places of business in Silver Spring, Maryland and Durham, North Carolina, making venue proper in this court. *See* I.R.C. § 7482(b)(1)(B).

the tax court, we affirm its judgment. Indeed, we have little to add to that court's thorough and persuasive reasoning.

The crux of this dispute, as explained above, is over Paragraph 2 of § 45C(c)'s coordination provision, which requires that overlapping expenses claimed for § 45C's orphan drug credit be counted as "base period research expenses" for purposes of § 41's research credit. The tax court adopted the Commissioner's plain-meaning interpretation, reading "base period research expenses" as encompassing expenses incurred during the benchmark period set out in § 41(c)(5)(A): the "3 taxable years preceding" the credit year. But United Therapeutics, again, contends that "base period research expenses" is a defined term of art, anchored to a definition in a prior version of § 41 – and that once that definition was repealed in 1989, Paragraph 2 became a dead letter with no application to this or any case.

We agree with the tax court that our "starting point" is "the existing statutory text" and not a provision repealed in 1989. *United Therapeutics*, 2023 WL 3496208, at *10 (quoting *Lamie*, 540 U.S. at 534). We further agree that the ordinary meaning of the relevant text – "base period research expenses" – is clear enough to resolve the question in this case. The parties do not dispute the meaning of "research expenses." And dictionaries and common usage alike tell us that "base period" refers to a period of time used as "a standard of comparison" or a "reference point" to measure change over time. *See United Therapeutics*, 2023 WL 3496208, at *7 & n.23 (quoting dictionary definitions). That is an exact match for § 41(c)(5)(A)'s "3 [preceding] taxable years," a three-year period that functions as the benchmark against which change over time – here, subsequent increases

14

in research expenditures – are measured.[8]  And that interpretation is consistent not only with plain text but also with the statutory structure, enabling both halves of the coordination provision to operate according to their terms.  *See id.* at *8.

Also like the tax court, we find support for this reading in § 41's only statutory definition of "base period," which likewise uses the term to mean a benchmark for comparison.  *See id.* at *7.  Subsection 41(e), governing a "basic research" component of the credit that is not at issue in this case, provides a specific definition of "base period" for "purposes of [that] subsection" alone.  I.R.C. § 41(e)(7)(B).  The tax court carefully detailed the operation of § 41(e).  *See United Therapeutics*, 2023 WL 3496208, at *7 n.24.  For present purposes, it is enough to say that § 41(e)(7)(B)'s "base period" also is a period of time "employ[ed] as a standard for comparison," consistent with the ordinary-meaning approach we take to Paragraph 2.  *Id.*

On appeal, United Therapeutics argues that this is exactly the wrong lesson to take from the definition in § 41(e).  According to the company, because Congress defined "base period" only for purposes of subsection § 41(e), Paragraph 2's reference to "base period research expenses" also must be read as applying only to the § 41(e) portion of the credit – and not to the § 41(c)(5)(A) credit for "qualified research expenses" at issue here.  In other words, if Paragraph 2 – requiring consideration of overlapping expenses in the

---

[8] As the tax court explored, 2023 WL 3496208, at *9, because the tax provisions at issue were repeatedly renewed and extended, it is difficult to pinpoint the time of enactment for purposes of considering the text's ordinary meaning.  *See Food Mktg. Inst.*, 588 U.S. at 434.  But because the ordinary meaning of "base period" has not changed over the 30-odd years pertinent to this case, that is not a problem here.

15

calculation of "base period research expenses" for "purposes of applying section 41," *see* I.R.C. § 45C(c)(2) – retains any meaning at all, it is only for purposes of applying § 41*(e)*.

But that, of course, is not what either provision says. Paragraph 2 mandates accounting for overlapping expenses in applying § 41 *generally* to subsequent taxable years. *Id.*[9] And § 41(e) makes express that it defines "base period" only for the limited purpose of applying that subsection. I.R.C. § 41(e)(7). We do not see how the plain meaning of "base period" in Paragraph 2 can be overridden by a definition in a different Code provision that is limited to that provision alone.

As far as the statute goes, then, we agree with the tax court. Construed according to its ordinary meaning, Paragraph 2's reference to "base period research expenses" encompasses United Therapeutics' overlapping expenses during the three-year period used as a temporal comparison point by § 41(c)(5)(A). That reading is consistent with plain text and with statutory context and structure. And unlike United Therapeutics' position, under which Paragraph 2 is to be ignored altogether, it contravenes neither the presumption against repeal by implication nor the principle of interpretation giving effect, if possible,

---

[9] Indeed, if Paragraph 2 applied only to § 41(e), it seems it would have no application at all. Section 45C(c)'s coordination provision instructs on the overlap between "qualified clinical testing expenses" (eligible for § 45C's orphan drug credit) and "qualified research expenses" (eligible for § 41's research credit). But "qualified research expenses" are relevant only to the portion of the research credit based, naturally enough, on "qualified research expenses," laid out at I.R.C. § 41(a)(1); they play no role in the portion based on "basic research" payments, set out at § 41(a)(2) and defined in § 41(e). So a taxpayer directed by Paragraph 2 of the coordination provision to account for its "qualified research expenses" for purposes of applying § 41(e) would come up empty. On United Therapeutics' reading, in other words, § 45C(c)'s coordination provision has nothing to coordinate.

16

to "every clause and word" of a statute. *United Therapeutics*, 2023 WL 3496208, at *12 (quoting *Loughrin*, 573 U.S. at 358). That is enough – more than enough – to resolve this case, because we discern congressional intent by reference to "the existing statutory text, . . . and not the predecessor statutes" on which United Therapeutics chiefly relies. *Id.* at *10 (quoting *Lamie*, 540 U.S. at 534).[10]

As for the regulations United Therapeutics points to for support, we may set to one side questions about the Treasury Department's authority to effectively repeal Paragraph 2, a statutory provision, by way of agency regulation. For the reasons given by the tax court, we read neither regulation to conflict with nor even to bear on Paragraph 2's plain meaning. That a regulation pertaining to "base period research expense[s]" under § 41 would apply only to "Taxable Years Beginning Before January 1, 1990," *see* Treas. Reg. § 1.41-3A, strikes us, as it did the tax court, as no more than an unremarkable acknowledgement that a regulation keyed specifically to § 41's statutory definition would expire along with that definition. It does nothing to limit the application or "constrain future interpretations" of § 45C(c)'s coordination provision. *United Therapeutics*, 2023

---

[10] We also are inclined to agree with the tax court that even the pre-1989 version of the coordination provision likely used "base period research expenses" for its ordinary meaning and not as a statutorily defined term of art. At that time, it is true, what is now § 41 included a definition of "base period research expenses." But the predecessor to the coordination provision refers to "base period research expenses" without citing that definition – in stark contrast to its citation, in the very same sentence, to the statutory definition for "qualified research expenses." *See United Therapeutics*, 2023 WL 3496208, at *11. Even if United Therapeutics could "[m]anufacture [a]mbiguity" using a predecessor statute – which it cannot, *see id.* at *10 – the predecessor statute here seems not to bear the weight the company would assign it.

17

WL 3496208, at *9 n.30.[11]   And the regulatory "consistency rule," as the tax court explained, does not in fact operate as United Therapeutics posits, forbidding a taxpayer from including overlapping expenses in its "base period research expenses" for prior years under Paragraph 2 while excluding those expenses from its current tax-year calculations under Paragraph 1.  Instead, the regulation "says simply that taxpayers must apply the same *definition* of qualified research expenses to the credit year and the three preceding years," regardless of any change in that definition.  *Id.* at *17.  "Nothing in the regulation," in other words, "purports to override the coordination rule of section 45C(c)."  *Id.*[12]

---

[11] On appeal, United Therapeutics emphasizes the 2001 redesignation of this regulation, arguing that the redesignation reflects agency agreement that the concept of "base period research expenses," as used in Paragraph 2 of the coordination provision, no longer has any application.  But that basic administrative step simply reordered the regulations in acknowledgment that the definition had been removed from the statute.  In the years since 1990, "Treasury and the IRS simply have not spoken regarding the meaning of 'base period research expenses,'" and "[s]ilence by Treasury and the IRS is no concession as to the nature of the amended statute."  *United Therapeutics*, 2023 WL 3496208, at *9 n.30.

[12] To the extent United Therapeutics relies on the statutory consistency rule from which the regulation derives, *see* I.R.C. § 41(c)(6)(A) (now § 41(c)(5)(A), *see supra* note 4), that reliance is also unavailing.  In its statutory form, the rule applies only in calculating a taxpayer's "fixed-base percentage," *id.*, a concept with no relevance to this case; it is only through regulation that the rule applies to the alternative simplified method of calculating the research credit at issue here.  And in any event, the statutory consistency rule, too, has been construed by courts and agency alike to require only that the "definition of qualified research expenses, which Congress has changed over the years, be applied consistently across the credit year and the years in the reference period."  *See United Therapeutics*, 2023 WL 3496208, at *9 (citing Treas. Reg. § 1.41-3(d)(1); *Trinity Indus.*, 757 F.3d at 411-12).

## III.

For the foregoing reasons, the judgment of the tax court is affirmed.

*AFFIRMED*